**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| GREATER AUGUSTA UTILITY DISTRICT,<br><br>*Plaintiff,*<br><br>*v.*<br><br>SAPPI NORTH AMERICA, INC.;<br>KIMBERLY-CLARK CORPORATION;<br>HUHTAMAKI, INC.;<br>AMERICAN TISSUE MILLS OF MAINE LLC; *and*<br>AMERICAN TISSUE CORPORATION,<br><br>*Defendants.* | C.A. No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff, GREATER AUGUSTA UTILITY DISTRICT, and for its Complaint against the Defendants, SAPPI NORTH AMERICA, INC.; KIMBERLY-CLARK CORPORATION; HUHTAMAKI, INC.; AMERICAN TISSUE MILLS OF MAINE LLC; *and* AMERICAN TISSUE CORPORATION (hereinafter, collectively, "Defendants"), avers and states as follows:

**INTRODUCTION**

1. Greater Augusta Utility District (hereinafter the "District" or "Plaintiff") owns and operates a public drinking water system supplying potable water to approximately 13,750 residents through 5,500 service connections in and around Augusta, Maine. The District draws its water from groundwater sources in Kennebec County, Maine.

2. The District's public water system infrastructure consists of five drilled groundwater wells—the South Gravel Well, the Triangle Gravel Well, the Brookside Gravel Well,

and the two Riverside Wells—and associated piping and distribution equipment located in Kennebec County, Maine.

3. The District's Riverside Wells, which are hydraulically connected to the Kennebec River, have been contaminated by PFOA and PFOS, as well as PFNA, PFHxS, PFHpA, and other PFAS compounds.

4. PFAS are a class of persistent, mobile, and toxic synthetic chemicals that can contaminate drinking water at extremely low concentrations and are difficult to remove through conventional treatment.

5. The Riverside Wells sit only a few hundred feet from the Kennebec River and draw from a river-influenced sand-and-gravel aquifer. When the District sampled the wells and the adjacent river on the same day in October 2021, the results were nearly indistinguishable: approximately 12.5 ng/L of PFAS6 in the wells and 12.6 ng/L in the river. Hydrogeologic investigations conducted on behalf of the District explain why—the river and the aquifer are hydraulically connected, and contaminants in the river migrate into the aquifer through riverbank filtration and induced infiltration. By November 2024, PFAS in the Riverside Wells had risen to approximately 23.3 ng/L, exceeding Maine's then-applicable drinking water standard.

6. As PFAS contamination increased, the District was forced to remove one of the Riverside Wells from service and undertake substantial response actions, including investigation, engineering evaluation, pilot testing, and construction of treatment infrastructure necessary to bring this well back online.

7. The District seeks recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") of necessary response costs incurred in response

to releases and threatened releases of PFOA and PFOS, and seeks damages and other relief under Maine law arising from PFOA, PFOS, and other PFAS contamination of its water supply.

8. Upon information and belief, Defendants owned and operated paper, paperboard, tissue, packaging, and related manufacturing facilities located upstream of the District within the Kennebec River watershed. These facilities used PFAS-containing materials and generated PFAS-containing wastewater, sludge, landfill leachate, stormwater, and other waste streams. PFAS released from one or more of those facilities entered the Kennebec River watershed, migrated downstream through surface water and hydrologically connected groundwater, and contributed to PFAS contamination of the Riverside Wells.

9. Defendants, and not the District, its taxpayers, or its customers, should bear the past, present, and future costs of investigating, monitoring, treating, and remediating PFAS contamination affecting the District's drinking water supply and restoring the Riverside Wells to full service.

## JURISDICTION AND VENUE

10. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief). Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")). Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to CERCLA §§ 107(a) and 113(g), 42 U.S.C. §§ 9607(a), 9613(g).

11. This Court has personal jurisdiction over Defendants by virtue of each Defendant's regular and systematic contacts with Maine pursuant to Maine's long-arm statute. 14 M.R.S. § 704-A.

12. Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

## PARTIES

13. **Plaintiff, GREATER AUGUSTA UTILITY DISTRICT ("The District"),** is organized and existing under the laws of the State of Maine and is authorized to operate a public water system under applicable state law. The District's principal place of business is in Kennebec County, Maine.

14. At all times relevant to this Complaint, the District has owned and operated a public water system serving the residents and businesses of Augusta, including the wells, treatment facilities, and distribution infrastructure described herein.

15. **Defendant, SAPPI NORTH AMERICA, INC. ("Sappi"),** is a Pennsylvania Corporation authorized to do business in the State of Maine. Sappi conducts and has conducted business in the State of Maine, including at its Somerset Mill located at 1329 Waterville Road, Skowhegan, ME 04976, where it operates an integrated pulp and papermaking operation spanning 2,500 acres ("Somerset Mill"). This Court has personal jurisdiction over Sappi because it maintains substantial and continuous business operations in Maine, owns and operates a major industrial facility within this District, and has sufficient minimum contacts with the State of Maine such that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

Sappi may be served with process by serving its registered agent at C T Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101.

16. **Defendant, AMERICAN TISSUE MILLS OF MAINE LLC,** is an New York Limited Liability Company and during the events described in this complaint, the principal place of business of American Tissue Mills of Maine LLC was 54 Maple Street, Augusta, ME 04330. American Tissue Mills of Maine LLC conducted business in the State of Maine, including at its recycled fiber pulp and tissue paper manufacturing facility located at 54 Maple Street, Augusta, Maine 04330, where it operated until August 2001. This Court has personal jurisdiction over American Tissue Mills of Maine LLC because it conducted substantial business activities in Maine, owned and operated an industrial facility in Augusta, Maine, and released hazardous substances into the environment within this judicial district that have caused injury to Plaintiff's water supply. American Tissue Mills of Maine LLC may be served with process by serving its registered agent at Corporation Service Company, 80 State Street, Floor 6, Albany, NY 12207.

17. **Defendant, AMERICAN TISSUE CORPORATION ("American Tissue Corp."),** is a New York Corporation headquartered in Hauppauge, New York and operated as part of the American Tissue paper and tissue manufacturing enterprise. Upon information and belief, American Tissue Corp., through its officers, employees, and management personnel, directly participated in the management and operation of the Augusta Tissue Mill (as defined below), including activities relating to manufacturing, wastewater and waste management, and environmental compliance. As alleged below, American Tissue Corp.'s direct participation in the operation of the Augusta facility subjects it to liability as an operator under CERCLA § 107(a). This Court has personal jurisdiction over American Tissue Corp. because its conduct giving rise to Plaintiff's claims included management and operation of an industrial facility in Augusta,

Maine, and releases and threatened releases of hazardous substances within this District. American Tissue Corporation may be served with process by serving the New York Secretary of State, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.

18. **Defendant KIMBERLY-CLARK CORPORATION ("Kimberly-Clark"),** is a Delaware Corporation authorized to do business in the State of Maine. Kimberly-Clark and its corporate predecessors owned and/or operated a paper mill in Winslow, Maine. This Court has personal jurisdiction over Kimberly-Clark Corporation because it conducted substantial business operations in Maine for years, owned and operated an industrial facility within the State, and released hazardous substances into Maine's environment that have caused injury to Plaintiff's water supply, thereby establishing minimum contacts with the forum state sufficient to satisfy due process requirements. Kimberly-Clark may be served with process by serving its registered agent at The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington, DE 19801.

19. **Defendant, HUHTAMAKI, INC. ("Huhtamaki"),** is a Kansas Corporation authorized to do business in the State of Maine. Huhtamaki conducts and has conducted business in the State of Maine, including at its manufacturing facility located at 242 College Ave, Waterville, Maine 04901. This Court has personal jurisdiction over Huhtamaki because it operates a large-scale manufacturing facility within this District and has sufficient minimum contacts with the State of Maine such that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. Huhtamaki may be served with process by serving its registered agent at Corporation Service Company, 80 State Street, Floor 6, Albany, NY 12207.

## FACTUAL BACKGROUND

### A. PFAS and Their Risk to Public Health

20. Per- and polyfluoroalkyl substances ("PFAS") are a large class of synthetic chemicals containing carbon-fluorine bonds, among the strongest bonds in chemistry. These properties make PFAS resistant to heat, water, oil, and chemical degradation and have led to their widespread use in industrial, commercial, and consumer applications.

21. PFAS have been used for decades in numerous products and industrial processes, including coatings, waxes, paints and inks; paper, paperboard, and packaging; textiles; plastics and resins; electronics; metal finishing; cleaning products; and other manufacturing applications. PFAS have also been used as surfactants, emulsifiers, processing aids, and water-, oil-, and grease-resistant treatments.

22. PFAS can adversely affect human health at extremely low concentrations. Drinking water concentrations of PFAS are commonly measured in nanograms per liter, equivalent to parts per trillion ("ppt"). To put that scale in perspective, 1.0 ppt is approximately equivalent to one drop of water in 20 Olympic-size swimming pools, or one second in approximately 32,000 years.[1]

23. PFAS are highly persistent and mobile in the environment. They resist degradation by light, water, and biological processes and can remain in environmental media for extended periods. Once released, PFAS can leach from soil and solid wastes, migrate through groundwater and surface water, and travel substantial distances from their original source.

24. EPA has recognized that PFAS may be released from industrial facilities through spills, process losses, wastewater and stormwater discharges, air emissions, solid-waste disposal,

[1] Gaines, L.G.T., "Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature review," American Journal of Industrial Medicine, Apr. 2022, https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362; see also U.S. EPA, Per- and Polyfluoroalkyl Substances (PFAS) Explained, EPA 800-F-22-003 (2022).

landfill leachate, and the management and land application of industrial residuals and biosolids. Because PFAS are persistent and mobile, these pathways may result in contamination of downstream surface waters, aquifers, and drinking water supplies.[2]

25. PFAS also bioaccumulate in humans and wildlife and can biomagnify through aquatic food webs. Human exposure to certain PFAS has been associated with adverse effects involving the immune system, liver, cardiovascular and developmental systems, cholesterol levels, pregnancy, and certain cancers.[3] EPA has concluded that PFOA and PFOS are likely to be carcinogenic to humans and are associated with other adverse health effects. Other PFAS, including PFNA, PFHxS, and PFHpA, have also been associated with developmental, immune, endocrine, hepatic, and other health effects.

26. EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5") required qualifying public water systems to monitor for 29 PFAS between 2023 and 2025, including PFOA, PFOS, PFNA, PFHxS, and PFHpA.

27. In April 2024, EPA established drinking water maximum contaminant levels of 4.0 ng/L for PFOA and 4.0 ng/L for PFOS. EPA subsequently proposed extending the compliance deadline for qualifying water systems to 2031 and proposed rescinding certain additional PFAS drinking water standards.

28. Effective July 8, 2024, EPA designated PFOA and PFOS as "hazardous substances" under CERCLA, 42 U.S.C. §§ 9601 et seq., based on EPA's determination that their release may present a substantial danger to public health or welfare or the environment. For

[2] U.S. EPA, Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances — Version 2, EPA-800-R-24-002 (Apr. 8, 2024), available at www.epa.gov/pfas.

[3] Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for Perfluoroalkyls (June 2021), Ch. 3 (Toxicokinetics), available at www.atsdr.cdc.gov; Olsen, G.W. et al., *Half-life of serum elimination of perfluorooctanesulfonate, perfluorohexanesulfonate, and perfluorooctanoate in retired fluorochemical production workers*, Environmental Health Perspectives 115:9 (Sept. 2007).

purposes of CERCLA's definition of hazardous substance, designation is not dependent upon a particular environmental concentration.

**B. PFAS Use and Release at Paper Mills**

29. PFAS have been used in paper and paperboard manufacturing for decades. Beginning at least by the 1960s, the paper industry used fluorochemical coatings and treatment products to impart resistance to grease, oil, water, and staining, particularly in coated paper, food-contact paper, paperboard, packaging, and other specialty paper products. PFAS-containing surfactants, sizing agents, defoamers, and other processing aids also were used in paper-manufacturing operations.

30. Fluorochemical manufacturers specifically developed and marketed PFAS-containing treatments for paper, paperboard, molded-fiber products, and grease-resistant food packaging. Such products included fluorochemical coating technologies marketed under names including Scotchban and Unidyne and were applied directly to paper and paper-based products to provide oil, grease, water, and food-release resistance.

31. Paper manufacturing is a water-intensive process. PFAS used or introduced during coating, pulping, finishing, equipment cleaning, recycled-fiber processing, and related operations can enter process water and wastewater, as well as wastewater-treatment sludge and other mill residuals. Paper mills historically located along rivers commonly used those rivers both as process-water sources and as receiving waters for treated industrial wastewater.

32. PFAS may also enter paper mills through recycled paper and paperboard used as fiber furnish. Recycled feedstock may contain food-contact paper, coated paper, packaging, and other materials previously treated with PFAS. When such material is repulped and processed,

PFAS can enter wastewater, sludge, and other residual waste streams even where a mill does not intentionally add PFAS during the manufacture of the new product.

33. PFAS introduced into paper-manufacturing operations do not necessarily disappear during manufacturing or conventional wastewater treatment. They may remain in wastewater, sludge, residual solids, landfill waste, and other manufacturing byproducts and thereafter be released through wastewater discharges, stormwater, landfill leachate, waste disposal, land application of residuals, and migration through groundwater and surface water.

34. EPA has identified paper manufacturing and related paper-product sectors as industries associated with PFAS handling and potential PFAS releases. These include Paper (Except Newsprint) Mills (NAICS 322121), Paperboard Mills (NAICS 322130), Other Paperboard Container Manufacturing (NAICS 322219), and Paper Bag and Coated and Treated Paper Manufacturing (NAICS 322220).

35. EPA's identification of these industries is consistent with the historical use of PFAS in coatings, sizing agents, grease- and water-resistant treatments, food-contact paper, packaging materials, and other paper products, and with the potential for PFAS to enter mill wastewater, sludge, recycled furnish, residuals, and waste-disposal systems. Maine has specifically recognized paper-mill residuals as a potential source of PFAS contamination. In 2020, the Maine PFAS Task Force identified papermill residuals as a potential PFAS source, noted that Maine DEP had begun requiring PFAS testing of papermill residuals before land application, and recognized PFAS contamination associated with lands receiving municipal wastewater and papermill residuals. These characteristics are particularly relevant here. Multiple existing and former paper, tissue, molded-fiber, and related manufacturing facilities operated along the Kennebec River upstream of the District's Riverside Wells during periods when PFAS-containing materials were used in the

paper industry. As alleged below, those facilities discharged industrial wastewater and managed wastewater-treatment sludge, residuals, stormwater, and other waste streams capable of transporting PFAS into the Kennebec River watershed.

**C. Source Water and the Riverside Wells**

36. Under the Safe Drinking Water Act, state Source Water Assessment Programs identify the geographic and hydrogeologic areas contributing water to public drinking water sources and evaluate their susceptibility to contamination. For groundwater wells, the relevant source-water or wellhead-protection area encompasses surface and subsurface areas through which contaminants may migrate toward and reach the well.

37. The District's Riverside Wells are river-adjacent sand-and-gravel wells subject to a delineated source-water protection area under Maine's Source Water Assessment Program. Maine's assessment determined that the groundwater capture zone for the Riverside Wells intersects the Kennebec River and recognized that contaminants entering the river may adversely affect groundwater quality in the source aquifer supplying the wells.

38. Hydrogeologic investigations conducted on behalf of the District likewise established that groundwater levels within the source aquifer are strongly influenced by the Kennebec River and that the river and aquifer are hydraulically connected. Pumping from the Riverside Wells induces groundwater flow toward the well field, providing a groundwater can migrate into the aquifer supplying the Riverside Wells.

**D. Migration and Contamination of the District's Drinking Water Supply with PFOA, PFOS and other PFAS**

39. Between Skowhegan and Augusta, the Kennebec River flows past a succession of existing and former paper mills that for decades drew process water from the river, returned wastewater, stormwater, and leachate to it, and managed their sludge and residuals on land within

its watershed. The river carries what those mills released downstream toward the Riverside Wells, and Maine DEP's monitoring of the river's water and fish traces that contamination reach by reach, from Skowhegan to the District's wellfield.

40. Maine DEP monitoring at multiple locations between Skowhegan and Augusta repeatedly documented PFOA, PFOS, and other PFAS in Kennebec River surface water. PFAS remained detectable throughout the river corridor and were present at substantial concentrations at Sidney and Augusta, immediately upstream of and adjacent to the District's river-influenced source area.

41. This Maine DEP monitoring includes the following results:

| **River location** | **Date** | **Reported PFAS6** |
|---|---|---|
| KSK, upstream Skowhegan | July 2022 | **1.11 ng/L** |
| KFF, Fairfield | July 2022 | **3.51 ng/L** |
| KFF, Fairfield | June 2025 | **3.61 ng/L** |
| KWV, Waterville | August 2023 | **5.33 ng/L** |
| KSD, Sidney | July 2024 | **9.33 ng/L** |
| KSD, Sidney | June 2025 | **13.4 ng/L** |
| KAG, Augusta | June 2022 | **7.79 ng/L** |
| KAG, Augusta | August 2023 | **10.5 ng/L** |

42. Plaintiff draws water from five groundwater wells. Two of those wells, known collectively as the Riverside Wells, are located only a few hundred feet east of the Kennebec River. The two Riverside Wells are the Bonenfant Well (Well 207) and MainEx Well (Well 208). MainEx was previously taken out of service for reasons unrelated to PFAS. The District removed Bonenfant from service on November 19, 2024 because of PFAS contamination. The Riverside Wells withdraw water from a sand-and-gravel aquifer that is hydraulically connected to the

Kennebec River. Plaintiff's remaining groundwater wells are located west of the Kennebec River near Bond Brook.

43. Every sample of Riverside Wells water summarized in Table I below contained PFOA above 4.0 ng/L, the numerical maximum contaminant level EPA established for PFOA in April 2024, and two of the three contained PFOS above EPA's 4.0 ng/L level for PFOS.

44. Beginning no later than 2021, PFAS contamination was detected in water produced from the Riverside Wells. On October 13, 2021, PFAS sampling conducted by Plaintiff detected PFOA, PFOS, PFHpA, and other PFAS compounds in water produced from the Riverside Wells at a combined PFAS6 concentration of approximately 12.5 ng/L. During the same sampling event, Plaintiff also collected a sample from the Kennebec River adjacent to the Riverside well field. That sample contained a nearly identical PFAS6 concentration of approximately 12.6 ng/L.

45. The similarity is no coincidence. As alleged above, the Kennebec River and the source aquifer are hydraulically connected, and the Riverside Wells' delineated capture zone intersects the river. When the Riverside Wells pump, they draw river water—and the PFAS it carries—into the aquifer.

46. Subsequent sampling confirmed that PFAS contamination persisted and worsened over time. Sampling conducted in March 2023 detected PFOS and PFOA in water produced from the Riverside Wells at a combined PFAS6 concentration of approximately 8.53 ng/L. By November 2024, PFAS concentrations at the Riverside Wells had increased to approximately 23.3 ng/L, exceeding Maine's then-applicable drinking water standard of 20 ng/L for PFAS6.

47. The contamination detected at the Riverside Wells was not mirrored throughout Plaintiff's water system. During the same period, PFAS sampling conducted at Plaintiff's Triangle Station source either detected substantially lower concentrations of PFAS or reported no detectable

PFAS. These results are consistent with contamination affecting the Riverside source area and its hydrologically connected watershed.

48. The District routinely monitors its drinking water sources for PFAS in accordance with applicable federal and state drinking water requirements and accepted analytical methodologies. Representative PFAS sampling results from the Riverside Wells, the adjacent Kennebec River, and other District sources are summarized in Table I below:

**Table I: PFAS Sampling Results for Riverside Wells and Kennebec River**

| **Sample Location** | **Date** | **PFOS (ng/L)** | **PFOA (ng/L)** | **PFHxS (ng/L)** | **PFHpA (ng/L)** | **PFAS6 Total (ng/L)** |
|---|---|---|---|---|---|---|
| Riverside Wells | 10/13/2021 | 5.52 | 4.43 | ND | 2.52 | 12.5 |
| Kennebec River *(adjacent to Riverside)* | 10/13/2021 | 3.97 | 5.01 | ND | 3.65 | 12.6 |
| Riverside Wells | 3/22/2023 | 3.87 | 4.66 | ND | ND | 8.53 |
| Riverside Wells | 11/4/2024 | 9.03 | 8.05 | 2.44 | 3.74 | 23.3 |
| Triangle Station | 12/9/2024 | ND | ND | ND | ND | ND |

49. The PFAS contamination documented in the Riverside Wells is consistent with extensive PFAS contamination documented throughout the Kennebec River watershed. Through its Surface Water Ambient Toxics ("SWAT") monitoring program, Maine DEP has repeatedly detected PFOS and other PFAS compounds in fish, shellfish, forage fish, and other aquatic organisms collected from the Kennebec River. Maine DEP has reported PFOS contamination in aquatic species collected from multiple locations along the river, including Hinckley, Fairfield, Gardiner, Augusta, and downstream locations. DEP has likewise detected PFOS in softshell clams collected from the Kennebec River and has reported that PFOS concentrations in certain forage

fish species were higher in the Kennebec River than in other Maine rivers evaluated during the same monitoring effort.

50. Maine DEP's fish-tissue monitoring further documents PFOS contamination throughout the Kennebec River corridor upstream of the Riverside Wells. Maine DEP detected PFOS in fish collected at Fairfield, Waterville, Sidney, Augusta, and other locations along the river, including repeated detections exceeding Maine CDC's applicable Fish Tissue Action Level. These results demonstrate that PFOS is present in and bioaccumulates throughout the river system between the upstream industrial facilities and the District's source area. The persistence of PFOS in fish at successive downstream locations, together with PFAS detected in Kennebec River surface water and in the Riverside Wells, is consistent with downstream transport through the Kennebec River and its hydraulically connected groundwater system.

51. Maine DEP's fish-tissue monitoring documented a substantial and recurring spatial difference between smallmouth bass collected upstream of the Somerset Mill and smallmouth bass collected downstream of the facility before the Kennebec River reaches the Waterville and Winslow industrial facilities. In July 2021, smallmouth bass composites collected at the KSK station in Skowhegan, upstream of the Somerset Mill, contained approximately 1.055 and 1.259 ng/g PFOS. In June 2021, smallmouth bass composites collected at the KFF station in Fairfield—downstream of the Somerset Mill but upstream of the Winslow Mill and Huhtamaki facilities (discussed below)—contained approximately 13.83 and 16.3 ng/g PFOS. Subsequent smallmouth bass composites collected at Fairfield contained approximately 18.32 and 25.49 ng/g PFOS in 2022 and approximately 29.77 and 30.98 ng/g PFOS in 2025. These repeated detections document substantial and persistent PFOS bioaccumulation in the Kennebec River after the river passes the Somerset Mill and before it reaches the downstream Waterville and Winslow industrial facilities.

52. Maine DEP also documented elevated PFOS concentrations in fish sampled in the Hinckley reach immediately downstream of the Somerset Mill and the associated Sappi–S.D. Warren sludge-landfill area. Black crappie composites collected at the KHK-DOWN station in August 2023 contained approximately 27.84 and 33.53 ng/g PFOS. Smallmouth bass composites collected at the nearby KHK station in May 2022 contained approximately 8.267 and 27.62 ng/g PFOS. These fish-tissue results, considered together with Maine DEP's direct detections of PFAS in wastewater discharged from the Somerset Mill and in untreated leachate generated by the Sappi–S.D. Warren sludge landfill, corroborate the allegation that PFAS released from the Somerset Mill entered the Kennebec River, bioaccumulated in aquatic organisms, and persisted downstream toward the Riverside Wells.

53. PFOS remained elevated as the river continued through the Waterville–Winslow industrial reach, home to the Huhtamaki Mill, the former Winslow Mill, and the outfall of the Kennebec Sanitary Treatment District. Smallmouth bass composites collected at the KWV station in August 2023 contained approximately 11.76 and 20.42 ng/g PFOS—concentrations exceeding Maine CDC's applicable Fish Tissue Action Level—and Kennebec River surface water at that station contained approximately 5.33 ng/L PFAS6. Farther downstream at the KSD station in Sidney, below the Waterville–Winslow reach and above the Riverside Wells, smallmouth bass composites collected in July 2024 contained approximately 10.9 and 13.21 ng/g PFOS. These results trace PFOS from the upstream mills through each successive reach of the river to the District's source-water area.

54. EPA and Maine DEP monitoring documented PFAS contamination in fish tissue collected from multiple locations upstream of Augusta and the Riverside Wells in 2008, 2014, and 2019. These detections demonstrate that PFAS contamination existed throughout the upstream

Kennebec River watershed for more than a decade before PFAS contamination ultimately forced Plaintiff to remove the Bonenfant Well from service.

55. As a result of PFAS contamination exceeding applicable drinking water standards, Plaintiff removed the Bonenfant Well from service on November 19, 2024 and undertook substantial response actions, including investigation, monitoring, pilot testing, engineering evaluation, design, and construction of an ion-exchange treatment system intended to restore the Riverside Wells to service. Plaintiff has incurred and will continue to incur substantial costs associated with investigating, monitoring, treating, and remediating PFAS contamination affecting its drinking water supply for decades to come.

56. Plaintiff has incurred actual and substantial response costs in connection with the PFOA and PFOS contamination affecting the Riverside Wells, including costs for PFAS sampling and laboratory analysis; hydrogeologic investigation and evaluation; engineering and pilot testing; design and construction of the ion-exchange treatment system; and related professional services necessary to investigate, monitor, evaluate, and respond to the contamination. These costs were incurred in response to releases and threatened releases of PFOA and PFOS affecting the District's drinking water supply and were necessary to protect and restore the District's drinking water sources. Plaintiff's response actions and the costs incurred in connection with those actions are consistent with the National Contingency Plan. Plaintiff continues to incur necessary response costs for monitoring, treatment, operation and maintenance of treatment infrastructure, and other measures required to address PFOA and PFOS contamination and threatened contamination of the Riverside Wells.

**E. Defendants and Their PFAS-Related Operations**

57. The Defendants identified below owned, operated, controlled, managed, used, or otherwise were responsible for industrial facilities located within the Kennebec River watershed upstream of Augusta. As described in greater detail below, those facilities manufactured paper, paperboard, coated paper products, packaging materials, and related products and engaged in industrial activities associated with PFAS use, handling, storage, management, disposal, release, and/or threatened release.

58. At all relevant times, Defendants knew or reasonably should have known that PFAS are highly persistent chemicals that resist degradation, migrate readily through groundwater and surface water systems, bioaccumulate in aquatic organisms, and create a substantial risk of contaminating drinking water supplies and natural resources when released into the environment.

59. Upon information and belief, PFAS previously released from Defendants' facilities remain present within the Kennebec River watershed and continue to migrate through groundwater, surface water, sediments, aquatic organisms, and other environmental media. As a result, releases and threatened releases of PFAS from Defendants' facilities continue to present a threat to Plaintiff's drinking water supply and have caused Plaintiff to incur and continue to incur response costs and damages.

60. Once PFAS released from Defendants' facilities reach the Kennebec River, they commingle in the river's water, sediments, and hydraulically connected groundwater. The PFAS that reach the Riverside Wells arrive as a single blended mixture drawn from the same river, and the District cannot separate one Defendant's PFAS from another's. The resulting contamination of the Riverside Wells, and the response costs it has caused, are indivisible.

## I. SOMERSET MILL, SKOWHEGAN, MAINE

61. The Somerset Mill is a 2,500-acre integrated pulp and paper complex at 1329 Waterville Road in Skowhegan, Maine, on the bank of the Kennebec River approximately 30 miles upstream of the Riverside Wells. Maine DEP has described the facility as including a woodyard, pulping and bleaching operations, three paper machines, a wastewater treatment plant with aeration lagoons and polishing ponds, multiple sediment retention ponds and stormwater systems, sludge-handling areas, and a large onsite landfill.

62. Sappi has owned and operated the Somerset Mill for its entire history. Sappi North America, Inc. is the Pennsylvania corporation formerly named S.D. Warren Company. S.D. Warren Company built the Somerset Mill in or about 1976 and owned and operated it as a subsidiary of Scott Paper Company until December 1994, when Sappi Limited acquired S.D. Warren Company. The same corporation continued to own and operate the Somerset Mill thereafter, doing business as Sappi Fine Paper North America and later as Sappi North America, and ultimately changed its legal name from S.D. Warren Company to Sappi North America, Inc. Sappi is therefore responsible for releases at and from the Somerset Mill throughout its operating history, not merely those occurring after 1994.

63. Throughout that history, the Somerset Mill has made the kinds of paper that fluorochemical treatments were designed for. Coated-paper machines began operating at the mill in approximately 1982, 1986, and 1990, and the mill grew from a pulp mill into a complex producing coated graphic papers, specialty label papers, and packaging grades, including folding-carton and solid bleached sulfate paperboard for food, beverage, pet-food, and other consumer packaging. In recent years, Sappi has expanded the mill's food-contact packaging production—including pet-food bags, soup-can labels, take-out containers, and popcorn packaging—and has

publicly reported that its rebuild of Paper Machine No. 1 was designed to apply specialized functional and grease-resistant coatings.

64. Those products required resistance to water, oil, grease, and stains—the performance characteristics fluorochemical paper treatments were developed to provide. Upon information and belief, Sappi purchased and used fluorochemical paper-treatment and coating products at the Somerset Mill, including products marketed under the Unidyne brand as fluorochemical grease and water repellents for food-contact paper. Unidyne products are fluorotelomer-based formulations that contain, or transform in the environment into, PFOA and related perfluoroalkyl carboxylic acids. Scott Paper's own patent filings from the period identify polyfluorocarbons as conventional release agents for coated paper and fluorocarbon coatings as suitable for paper substrates, confirming that the Scott organization was familiar with fluorinated coating technologies while its S.D. Warren subsidiary operated the Somerset Mill.

65. PFAS used at the Somerset Mill did not stay in the paper. They entered process water, coating and equipment wash water, spills, and broke, and from there the mill's wastewater, sludge, stormwater, and landfill systems. The mill's wastewater treatment plant—primary and secondary clarifiers, aeration basins, and polishing ponds—has historically treated approximately 24 to 25 million gallons of wastewater per day and discharges the treated effluent directly to the Kennebec River. Conventional wastewater treatment does not destroy PFAS.

66. Maine DEP has measured what the mill discharges. Under its LD 1911 PFAS monitoring program, Maine DEP sampled effluent discharged from the Somerset Mill's permitted outfall to the Kennebec River during 2023 and detected PFOS, PFOA, PFHxA, PFHpA, PFNA, PFPeA, and other PFAS. PFOS reached approximately 22.6 ng/L and PFAS6 approximately 24.5

ng/L. At that concentration, a discharge of 24 million gallons per day carries roughly two grams of PFAS6 into the Kennebec River every day—more than 800 grams per year.

67. The mill's landfill is a second, continuing source. Since approximately 1982, the Somerset Mill has disposed of wastewater-treatment sludge, ash, lime mud, and other residuals in a licensed onsite special-waste landfill that has grown to at least seven disposal cells covering roughly 45 acres, with approximately 2.2 million cubic yards of permitted capacity. The landfill generates leachate, which is collected and conveyed to the wastewater treatment plant and discharged with the mill's effluent. Maine DEP sampled untreated leachate at multiple collection points between November 2021 and October 2023 and repeatedly detected PFOA at concentrations up to 3,110 ng/L and PFAS6 up to 6,480 ng/L—more than 300 times the 20 ng/L PFAS6 standard discussed above. Runoff from the landfill area discharges through a sediment retention pond to a tributary of Craigin Brook, which flows to the Kennebec River.

68. The mill also spread its PFAS on the land. Maine DEP documented that the mill's sludge was dewatered and, at various times, landfilled, incinerated, and land-applied on S.D. Warren property and on privately owned property in the area. Maine DEP selected Skowhegan for investigation in its statewide review of PFAS-contaminated sludge because of the Somerset Mill, found elevated PFAS, including PFOA and PFOS, in Somerset Mill biosolids, and found elevated PFAS in soils and groundwater at properties where Somerset Mill sludge had been applied.

69. Stormwater, spills, and groundwater provide additional pathways. Stormwater from the mill's manufacturing, paper-machine, pulp-mill, woodyard, sludge-management, and landfill areas is routed through multiple sediment retention ponds and outfalls to unnamed tributaries, Craigin Brook, Martin Stream, and the Kennebec River itself. Between approximately 2006 and 2015, Maine DEP documented numerous releases of process water, paper-machine effluent,

landfill leachate, contaminated stormwater, and wastewater-treatment residuals to these ponds and drainage systems. Maine DEP has identified 53 Solid Waste Management Units and 13 Areas of Concern at the facility and determined that groundwater beneath it flows west to east and discharges to the Kennebec River or to streams that empty into it. Maine DEP also noted significant data gaps, including the absence of groundwater monitoring wells and soil sampling in the woodyard, pulp mill, and paper mill areas.

70. The river records these releases. As alleged above, PFOS in Kennebec River fish rises sharply as the river passes the Somerset Mill—from approximately 1 ng/g in smallmouth bass upstream at Skowhegan to as high as 33.53 ng/g in fish collected at Hinckley, immediately downstream of the mill and its sludge landfill, among the highest PFOS concentrations measured anywhere on the river—and remains elevated at Fairfield before the river reaches any other Defendant's facility.

71. Sappi released hazardous substances, including PFOA and PFOS, at and from the Somerset Mill through wastewater discharges, landfill leachate, land application of residuals, stormwater, spills, and groundwater discharge. Those releases occurred throughout Sappi's ownership and operation of the facility, and they are continuing: the mill discharged PFAS to the Kennebec River in 2023, and its landfill continues to generate PFAS-laden leachate. Upon information and belief, no permit issued for the Somerset Mill identified, limited, or authorized the discharge of PFOA, PFOS, or other PFAS.

72. Sappi is the current owner and operator of the Somerset Mill and owned and operated it at the time hazardous substances were disposed of there, and is liable under CERCLA § 107(a)(1) and (a)(2), 42 U.S.C. § 9607(a)(1)–(2). As a direct and proximate result of Sappi's

releases, the District has incurred and will continue to incur response costs to investigate, monitor, and treat PFOA, PFOS, and other PFAS in the Riverside Wells.

## II. WINSLOW MILL, WINSLOW, MAINE

73. The Winslow Mill ("Winslow Mill") stood on the east bank of the Kennebec River at or near what is now 14 Benton Avenue in Winslow, Maine, upstream of the Riverside Wells. The Hollingsworth & Whitney Company built it between approximately 1891 and 1893, and it grew into what contemporary accounts called Kennebec County's largest pulp and paper mill: a roughly 110-acre complex with multiple paper machines and a groundwood pulp mill, producing approximately 235 to 350 tons of paper per day for packaging, food protection, printing, tags, cups, envelopes, and office equipment.

74. In or about 1954, Hollingsworth & Whitney merged into Scott Paper Company, which owned and operated the Winslow Mill for the next four decades. In December 1995, Kimberly-Clark acquired Scott Paper Company in a $9.4 billion merger. Kimberly-Clark then owned and operated the Winslow Mill, integrated it into its own manufacturing operations, and permanently closed it in 1997, after which it sold the property to Kennebec River Development Park. Upon information and belief, Scott Paper Company survived the merger, became the Kimberly-Clark Tissue Company, and ultimately was liquidated into Kimberly-Clark. Kimberly-Clark is liable both for its own ownership and operation of the Winslow Mill and, as successor to Scott Paper Company and Hollingsworth & Whitney, for releases that occurred during their ownership and operation.

75. The Winslow Mill was known for its brown and white wrapping papers and also produced butcher paper and other food-contact and packaging papers. Those grades depended on grease-proofing: butcher paper, for example, must keep meat juices and oils from soaking through,

and for decades no other available chemistry matched the grease resistance that fluorochemicals provided. By the 1970s, fluorochemical grease-proofing and barrier treatments were in wide use throughout the paper industry for exactly these products, including 3M's Scotchban paper protectors such as FC-807, which were designed for application to paper and approved for food-contact use.

76. Upon information and belief, from at least the 1970s until the mill closed in 1997, Scott Paper and then Kimberly-Clark used fluorochemical paper treatments at the Winslow Mill—including products marketed as Scotchban, Lodyne, and Zonyl—to make wrapping, butcher, and other food-contact papers resistant to water, oil, and grease. Scotchban products were based on perfluorooctane sulfonyl chemistry that contains and degrades to PFOS; Lodyne and Zonyl products were fluorotelomer-based chemistries that contain or degrade to PFOA and related PFAS.

77. Both companies knew these chemicals. Scott Paper's patents identified polyfluorocarbons as conventional release agents for coated paper and fluorocarbon coatings as suitable precoats for paper substrates. Kimberly-Clark's own patents identified fluorochemicals as a recognized category of papermaking additives, and a 1970 Kimberly-Clark patent described paper intentionally treated with 3M fluorochemical products including FC-95—the potassium salt of PFOS—as well as FC-134, FC-807, and FC-12. By at least 1993, Kimberly-Clark was meeting with 3M about fluorochemical products and developing protocols for their application, and its product-safety, industrial-hygiene, and management personnel continued for decades to review fluorochemical toxicology, employee exposure data, PFOS blood-level information, and fluorochemical restrictions.

78. The Winslow Mill also ran a substantial recycled-fiber operation, processing approximately 200 tons of waste paper per day into approximately 150 tons of recycled pulp.

Recycled furnish carries PFAS from previously treated food-contact paper, packaging, and coated paper into the mill. The mill treated its wastewater through clarification, activated-sludge treatment, and dewatering, generating approximately 50,000 wet tons of recycled-fiber sludge and 10,000 wet tons of paper-mill sludge per year, which it mixed with boiler ash and managed through Maine DEP–approved residual utilization programs, including land application within the Kennebec River watershed.

79. Upon information and belief, PFAS used and processed at the Winslow Mill were released to the environment through the mill's wastewater discharges directly to the Kennebec River; the management and land application of PFAS-containing sludge and residuals; and spills, leaks, and overflows from the mill's chemical-handling and drainage systems. Closure and remediation records document hazardous-waste accumulation areas, chemical unloading areas, storage tanks, process piping, floor drains, and stormwater conveyances at the facility, including drains and conveyances that required remediation and closure, and EPA records reflect corrective action and institutional controls on the 110-acre former mill site.

80. The Winslow Mill's releases entered the Kennebec River and its hydraulically connected groundwater in the Waterville–Winslow reach, where, as alleged above, Maine DEP has documented PFOS in fish above Maine CDC's Fish Tissue Action Level and persisting downstream through Sidney to the District's source-water area. PFAS released at the site continue to leach and migrate from contaminated soils, sediments, and groundwater.

81. Kimberly-Clark is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), as an owner and operator of the Winslow Mill at the time hazardous substances, including PFOA and PFOS, were disposed of there, and as successor to the facility's prior owners and operators. As a

direct and proximate result of releases at and from the Winslow Mill, the District has incurred and will continue to incur response costs.

## III. HUHTAMAKI MILL, WATERVILLE, MAINE

82. Upon information and belief, the paper mill at 242 College Avenue, Waterville, Maine has operated continuously since at least 1908, originally as Keyes Fibre Company, then as the Chinet Company, and since 1999 as part of Huhtamaki Food Service (the “Huhtamaki Mill”). Upon information and belief, Huhtamaki Food Service has continued to operate under the Chinet brand name and is a division of Defendant Huhtamaki, Inc. The Huhtamaki Mill manufactures molded-fiber disposable tableware, including Chinet-brand plates, bowls, trays, and food-service containers.

83. EPA classifies the Huhtamaki Mill as a paper-manufacturing and converted-paper-products facility engaged in nonfolding sanitary food-container manufacturing. EPA records also reflect historical permitting associated with Keyes Fibre Company, confirming the continuity of industrial operations at the site before Huhtamaki’s acquisition. The facility also operates as an active hazardous-waste generator and is subject to federal environmental reporting requirements.

84. Industry patents and technical publications from the relevant time period describe fluorinated perfluoroalkyl paper-sizing and treatment agents designed for paper plates, food packaging, and grease-resistant paper products, including technologies tested using Chinet paper-plate manufacturing equipment. Upon information and belief, PFAS-containing treatment products were used at the Huhtamaki Mill in connection with the manufacture of Chinet molded-fiber products. Huhtamaki was an active purchaser of significant quantities of fluorochemical treatment products for Chinet’s product line. Fluorochemical treatment of molded-pulp disposable plates and containers was used to improve water and grease resistance.

85. Upon information and belief, Huhtamaki met regularly with PFAS manufacturers regarding the use of PFAS products in molded paper-plate manufacturing. Huhtamaki also monitored PFAS testing results and regulatory developments affecting fluorochemical use in its food-service products.

86. The Huhtamaki Mill's molded-fiber manufacturing process involves suspending pulp fibers in water in a blend tank, vacuum-forming the pulp onto molds, and drying the molded products in ovens. Three-dimensional molded-fiber food-service products require chemical treatment to impart water and grease resistance, and such treatment was historically applied during the wet-end or blend-tank stage of production. PFAS-containing treatment products were historically used in molded-fiber food-service products to impart grease, oil, and water resistance and other barrier properties.

87. Upon information and belief, the use of PFAS-containing treatment products in the Huhtamaki Mill's wet-end manufacturing processes generated PFAS-containing process wastewater, whitewater, cleaning water, residuals, solids, sludge, and other manufacturing wastes. Because PFOA, PFOS, and other PFAS compounds are highly persistent and resistant to degradation, PFAS contained in or associated with these process residuals remained present after manufacturing and wastewater-treatment processes. These PFAS-containing wastewater streams, residuals, sludges, solids, and other wastes provided pathways for releases of PFOA and PFOS through wastewater discharges, stormwater, waste-management practices, and other environmental pathways associated with the Huhtamaki Mill's industrial operations.

88. The Huhtamaki Mill does not treat its own process wastewater. Upon information and belief, since at least 1976, when KSTD's treatment plant was completed, the mill has sent its process wastewater—including whitewater from the wet-end stage where fluorochemical

treatments were applied—through the sewer to the Kennebec Sanitary Treatment District ("KSTD") wastewater treatment plant at 401 Water Street in Waterville. In its 2015 renewal of KSTD's discharge permit (MEPDES Permit No. ME0100854), Maine DEP found that Huhtamaki (formerly The Chinet Company) is the largest of KSTD's five significant industrial users, manufactures approximately 150 tons per day of molded-pulp products from recycled and virgin pulp fibers, and conveys approximately 1.6 million gallons per day of process wastewater to KSTD, roughly one-quarter of the plant's average daily flow. KSTD regulates Huhtamaki as a Significant Industrial User under its industrial pretreatment program. KSTD allocates costs according to the solids each user sends to the plant, and in 2023 it attributed approximately 44 percent of those costs to Huhtamaki—more than it attributed to the entire City of Waterville.

89. Conventional municipal wastewater treatment does not destroy PFAS. PFAS entering KSTD from the Huhtamaki Mill either pass through the plant into its treated effluent, which KSTD discharges to the Kennebec River in Waterville, or partition into the plant's sludge. Maine DEP testing has detected PFAS in wastewater collected from Huhtamaki before it enters KSTD and in the effluent KSTD discharges to the Kennebec River. By sending PFAS-containing process wastes to KSTD for treatment and disposal, Huhtamaki arranged for the disposal and treatment of hazardous substances, including PFOA and PFOS, at a facility from which those substances have been released to the Kennebec River.

90. Some of Huhtamaki's wastewater reaches the river without any treatment at all. KSTD's collection system includes combined sewer overflow outfalls at its Main pump station in Waterville, at its Fairfield pump station, and adjacent to the treatment plant, which discharge untreated combined wastewater and stormwater directly to the Kennebec River when flows exceed the system's capacity. Upon information and belief, PFAS-containing process wastewater from

the Huhtamaki Mill has been discharged to the Kennebec River through these overflows. No permit issued to KSTD identifies, limits, or requires monitoring of PFOA, PFOS, or other PFAS.

91. The same wastes reached the land. From approximately 1979 until at least 2003, KSTD land-applied its sludge—which contained PFAS from the Huhtamaki Mill—on agricultural fields in Fairfield, Benton, Unity, and other communities in the Kennebec River watershed upstream of Augusta, and received state approval to spread more than 285,000 cubic yards of the material. State testing has since documented severe PFAS contamination of groundwater in those communities, including a private well in Fairfield containing 54,100 ng/L PFAS6. Upon information and belief, PFAS from these land-application sites have migrated through groundwater and runoff into tributaries of the Kennebec River upstream of the Riverside Wells.

92. The Huhtamaki Mill also discharges directly to the river. Its MEPDES permit, No. ME0037389, authorizes the discharge of up to 1.5 million gallons per day of cooling water, together with stormwater from the facility, through its "North End" Outfall #001 to the Kennebec River. That cooling water is drawn from the Kennebec River and has been used to cool both the plant's air compressors and the manufacturing process itself; in 2018, Huhtamaki proposed installing a heat exchanger to fully segregate the cooling water from process water. The permit contains no effluent limitations or monitoring requirements. Upon information and belief, PFAS from the manufacturing process and from stormwater contacting manufacturing, storage, and waste-handling areas have been discharged through this outfall to the Kennebec River.

93. Each of these pathways—KSTD's effluent, KSTD's combined sewer overflows, the land-applied sludge, and the North End outfall—delivers PFAS to the Kennebec River upstream of the Riverside Wells. As alleged above, Maine DEP has documented PFOS in fish in

the Waterville–Winslow reach above Maine CDC's Fish Tissue Action Level, persisting downstream at Sidney above the District's source-water area.

94. The Huhtamaki Mill is approximately 20 miles upstream of the District. Because PFOA and PFOS are highly persistent and mobile, releases of these hazardous substances to wastewater, groundwater, stormwater, and surface water can migrate through interconnected hydrologic pathways, including the Kennebec River and river-connected aquifers. Upon information and belief, PFOA and PFOS released from the Huhtamaki Mill entered the Kennebec River and associated groundwater system, migrated downstream toward the District's source-water area, and contributed to contamination affecting the Riverside Wells through induced infiltration and groundwater connection.

95. As a result of releases of PFOA and PFOS from the Huhtamaki Mill and from the KSTD facility and land-application sites to which Huhtamaki's wastes were sent, the District has incurred and will continue to incur necessary response costs associated with investigation, monitoring, treatment, remediation, and other measures necessary to protect its drinking water supply.

## IV. AUGUSTA TISSUE MILL

96. The former Augusta Tissue Mill was located on Maple Street, Augusta, Maine, along the east side of the Kennebec River and occupied approximately 17–20 acres ("Augusta Tissue Mill").

97. Paper mills have operated at the Augusta Tissue Mill site since the nineteenth century. The facility was acquired around 1970 by Statler Industries, Inc. ("Statler"), which operated it as a recycled-fiber tissue mill. In the mid-1990s, American Tissue Maine acquired

Statler and continued operations until the facility ceased manufacturing operations in approximately 2001.

98. The Augusta Tissue Mill was located only a few hundred feet from the District's Riverside Wells. As a result, releases of PFAS and PFAS precursors from chemical storage areas, wastewater management systems, industrial operations, sludge handling activities, and other sources at the facility had a direct pathway to the groundwater supplying the Riverside Wells. The facility's proximity to the wells materially increased the likelihood that contaminants released at the site would migrate into the District's drinking water sources.

99. Environmental investigations at the former Augusta Tissue Mill have documented that the facility is situated immediately adjacent to the Kennebec River, that groundwater beneath the property is inferred to flow toward the river, and that contaminants released at the site are expected to migrate through surface runoff and groundwater and discharge to the river. Site investigations have identified historic wastewater infrastructure, drains, outfalls, effluent lines, discharge points, process piping, floor drains, and wastewater conveyances providing multiple mechanisms by which contaminants associated with mill operations could migrate into surrounding soils, groundwater, and the Kennebec River.

100. The mill operated wastewater treatment lagoons capable of holding approximately three million gallons of wastewater, maintained an open-top sludge management area, generated wastewater treatment residuals and paper-mill sludge, and utilized numerous chemical treatment systems throughout the facility, including polymers, release agents, de-inking chemicals, and Kymene-based treatment systems. The facility also operated a wastewater treatment plant and sludge loading pad used to store wastewater-treatment sludge prior to transport and disposal at the East Augusta Landfill.

101. Statler manufactured sanitary paper products including single-ply tissue paper, napkins, facial tissue, toilet paper, and paper towels at the Augusta Tissue Mill. The paper manufacturing process involved the use of chemical processing aids, paper coatings for water and oil resistance, and various chemical treatments applied during tissue paper production. At its peak, the mill employed up to 550 workers and was Augusta's largest private employer, and operated air emission sources and wastewater treatment systems associated with large-scale paper production.

102. The Augusta Tissue Mill included two paper machines, multiple industrial boilers, and a wastewater treatment plant with bulk chemical storage, including tanks containing phosphoric acid, sodium hypochlorite, and ammonium hydroxide, and maintained approximately 100 drums, 50 totes, and multiple bulk tanks of processing chemicals on the east bank of the Kennebec River. The mill operated a recycled fiber pulp and tissue paper mill with the capacity to produce 160–170 tons per day of usable pulp derived from recycled paper feedstock. The mill's industrial processes included de-inking, chemical digestion, and coating operations to remove clay, glue, and ink from recycled paper materials before reprocessing secondary fibers into tissue products.

103. Upon information and belief, PFAS compounds and PFAS precursors were used at the Augusta Tissue Mill as processing aids, de-inking additives, wastewater-treatment additives, and paper-treatment chemicals. PFAS and PFAS precursors were also introduced into the facility through recycled paper feedstock, which the mill used as its primary source of fiber from approximately 1970 until operations ceased. Recycled paper streams commonly contain PFAS-treated consumer and commercial paper products, including materials treated with grease-resistant, oil-resistant, and water-resistant coatings.

104. PFAS and PFAS precursors used, handled, generated, or processed at the Augusta Tissue Mill were released into the environment through multiple pathways, including wastewater discharges to the Kennebec River, wastewater-treatment lagoons, sludge handling and disposal activities, stormwater runoff, leaks from process piping and wastewater infrastructure, releases from chemical storage areas, floor drains, wastewater drains, and migration through soil and groundwater. These releases caused PFAS to enter and threaten to enter groundwater and surface water hydraulically connected to the District's drinking water sources.

105. The mill's wastewater treatment plant discharged directly to the Kennebec River, and the mill sent sludge waste to the nearby East Augusta landfill (known in Maine regulatory documents as the Augusta Tissue LLC Sludge Landfill).

106. The East Augusta landfill, located on Church Hill Road, received sludge generated by the mill's wastewater treatment plant. The landfill continues to generate leachate that is collected and managed by Maine DEP and the District. Sampling conducted by the Maine DEP detected PFOA, PFOS, and numerous other PFAS compounds in leachate from the Augusta Tissue sludge landfill, including PFOA at 94.2 ng/L and PFOS at 266 ng/L. These detections provide direct evidence that PFAS associated with sludge generated by the Augusta Tissue Mill entered and remain present in landfill leachate associated with the facility.

107. The facility generated substantial quantities of wastewater-treatment sludge and paper-mill residuals. State and federal regulators subsequently addressed environmental concerns associated with sludge disposal areas connected to the mill in Augusta and Vassalboro.

108. Upon information and belief, Statler Industries released hazardous substances, including PFOA and PFOS, from the Augusta Tissue Mill during its operations.

109. The Augusta Tissue Mill is located within the source water protection area for the District's groundwater supply. Hazardous substances released at the site, including PFOA and PFOS, migrated or threatened to migrate through groundwater pathways directly connecting the facility to the Riverside Wells, as well as through interconnected groundwater and surface-water pathways associated with the Kennebec River.

110. In or about the mid-1990s, Defendant **American Tissue Mills of Maine LLC** ("American Tissue Maine") acquired and assumed ownership and operation of the Augusta Tissue Mill. American Tissue Maine thereafter owned and operated the recycled-fiber pulp and tissue manufacturing facility, including its paper machines, wastewater-treatment system, sludge-management operations, chemical-storage and handling areas, and associated waste-disposal facilities, until manufacturing operations ceased in August 2001.

111. American Tissue Maine operated as part of the American Tissue group of paper and tissue manufacturing companies headquartered in Hauppauge, New York. Upon information and belief, Defendant **American Tissue Corporation** ("American Tissue Corp.") was a parent, affiliated, and/or controlling entity within that enterprise and participated directly, through its officers, employees, and management personnel, in the acquisition, financing, management, and operation of paper-manufacturing facilities within the American Tissue organization, including the Augusta Tissue Mill.

112. Upon information and belief, American Tissue Corp. did more than exercise the ordinary financial oversight associated with ownership of a subsidiary or affiliate. Through common senior management and personnel acting on behalf of American Tissue Corp., American Tissue Corp. participated directly in and exercised control over operations at the Augusta Tissue Mill, including decisions concerning production, manufacturing processes, chemical use and

handling, wastewater treatment and discharge, sludge and residuals management, waste disposal, environmental compliance, and the continuation and cessation of mill operations.

113. During American Tissue's operation of the Augusta Tissue Mill, the facility processed large quantities of recycled paper, generated industrial wastewater and wastewater-treatment sludge, handled substantial quantities of papermaking and wastewater-treatment chemicals, discharged wastewater directly to the Kennebec River, and disposed of sludge generated by the mill at the associated Augusta Tissue landfill. As alleged above, PFAS, including PFOA and PFOS, were released through these manufacturing, wastewater, sludge-management, disposal, and related operations.

114. When operations ceased in 2001, substantial quantities of industrial chemicals and wastes remained at the facility. Subsequent EPA investigations identified bulk chemical-storage tanks at the wastewater-treatment plant, numerous tanks containing chemicals used in tissue manufacturing and wastewater treatment, abandoned drums and totes, residual chemicals within process piping, and other hazardous materials requiring removal. These conditions further evidence the industrial chemical-handling, wastewater-treatment, and waste-management operations conducted during American Tissue's operation of the facility.

115. American Tissue Maine's ownership and operation of the Augusta Tissue Mill during a period in which hazardous substances, including PFOA and PFOS, were used, handled, generated, disposed of, and released renders American Tissue Maine liable as an owner and operator of a facility from which there were releases and threatened releases of hazardous substances within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a).

116. Upon information and belief, American Tissue Corp., through its own officers, employees, and agents acting on its behalf, directly managed, directed, or conducted operations at

the Augusta Tissue Mill relating to the handling and disposal of industrial wastes, wastewater treatment and discharge, sludge and residuals management, chemical handling, and environmental compliance. American Tissue Corp. therefore also operated the Augusta Tissue Mill during a period of disposal and release of hazardous substances and is independently liable as an "operator" under CERCLA § 107(a), 42 U.S.C. § 9607(a).

117. The Augusta Tissue Mill was demolished in 2009. An EPA-led cleanup at the Augusta Tissue Mill removed PCBs and oil from the soils. Maine DEP and EPA conducted oversight of the Augusta Tissue Mill following its closure. EPA subsequently conducted a removal action at the facility and removed tens of thousands of gallons of industrial chemicals, dozens of drums and totes, residual chemicals contained within process piping, wastewater-treatment chemicals, and other hazardous materials remaining from decades of paper-manufacturing operations. EPA removed more than 2,250 gallons of PCB oil, 28 transformers, and hazardous materials throughout approximately 15 buildings.

**FIRST CAUSE OF ACTION**
**Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

118. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

119. This Count seeks recovery only of response costs incurred in response to releases or threatened releases of PFOA and PFOS.

120. Under CERCLA, 42 U.S.C. §§ 9601, et seq., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation. 42 U.S.C. § 9607(a).

121. Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

122. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

123. Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), as are the KSTD wastewater treatment plant and each site at which KSTD sludge containing PFAS from the Huhtamaki Mill was applied or disposed.

124. PFOA and PFOS are each a "hazardous substance" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14), by designation pursuant to CERCLA § 102, 42 U.S.C. § 9602.

125. Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and Huhtamaki is also a person who arranged for disposal or treatment of hazardous substances within the meaning of CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

126. As alleged above, each Defendant is a covered person within one or more of the liability categories set forth in CERCLA § 107(a).

127. CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…." 42 U.S.C. § 9601(22).

128. There have been releases and threatened releases of PFOA, PFOS, or both from each facility described above within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22). Upon information and belief, such releases or threatened releases are continuing.

129. The hazardous substances released or threatened to be released from the facilities have migrated, and continue to migrate, through groundwater, surface water, air deposition, or other applicable pathway to Plaintiff's drinking water source.

130. The releases and threatened releases have caused Plaintiff to incur necessary response costs, including the investigation, monitoring, evaluation, design, treatment, and other response costs alleged above.

131. The necessary response costs incurred by Plaintiff are consistent with the National Contingency Plan, and Plaintiff reasonably expects to incur additional necessary response costs consistent with the National Contingency Plan.

132. Each Defendant is liable under CERCLA § 107(a) for Plaintiff's recoverable response costs, together with interest as provided by CERCLA.

133. As alleged above, the contamination and resulting response costs are indivisible. Defendants are therefore jointly and severally liable for Plaintiff's recoverable response costs.

## SECOND CAUSE OF ACTION
**Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)**

134. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

135. CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. § 9607(a),] the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

136. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under

42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances in Plaintiff's public drinking water supply as referenced herein.

137. A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

138. A declaratory judgment will establish Defendants' liability for future response costs associated with addressing the contamination of the public water supply, ensuring an equitable and efficient response to the problem.

139. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

140. Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances.

141. Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

142. Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## <u>THIRD CAUSE OF ACTION</u>
## Statutory and Continuing Public Nuisance

143. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

144. Under 17 M.R.S. § 2701, a person injured in its property or the enjoyment of its estate by a common and public or private nuisance may maintain a civil action against the offender for damages.

145. Maine law further expressly provides that "corrupting or rendering unwholesome or impure the water of a river, stream, pond or aquifer" constitutes a nuisance. 17 M.R.S. § 2802.

146. The Kennebec River and the groundwater aquifer supplying the District's Riverside Wells constitute a river and aquifer within the meaning of 17 M.R.S. § 2802.

147. As alleged above, Defendants owned and/or operated industrial facilities within the Kennebec River watershed at which PFAS-containing materials, including materials containing or capable of generating PFOA and PFOS, were used, handled, processed, stored, discharged, disposed of, and/or released.

148. Defendants caused and/or contributed to releases of PFOA, PFOS, and other PFAS into environmental media through wastewater discharges, process-water releases, spills and leaks, stormwater runoff, landfill leachate, sludge and residuals management, disposal activities, groundwater migration, and other pathways described herein.

149. PFOA, PFOS, and other PFAS released from Defendants' facilities entered and contaminated the Kennebec River watershed and hydrologically connected groundwater. Those contaminants migrated downstream through surface water and groundwater and into the river-influenced aquifer supplying the District's Riverside Wells.

150. Defendants' releases thereby corrupted and rendered unwholesome or impure waters of the Kennebec River and the aquifer supplying the Riverside Wells within the meaning of 17 M.R.S. § 2802.

151. Independently and in addition, Defendants' releases and the resulting contamination have substantially and unreasonably interfered with rights common to the public, including the public's interest in clean and uncontaminated water resources and a safe public drinking water supply.

152. The contamination has impaired the District's ability to withdraw, treat, and provide uncontaminated drinking water to approximately 13,750 residents and has required the District to investigate, monitor, and treat contamination affecting a public drinking water source.

153. The presence and continuing migration of PFOA, PFOS, and other PFAS in the Kennebec River, its hydrologically connected groundwater system, and the Riverside Wells constitute a continuing public and statutory nuisance.

154. In addition to the injury suffered by the public generally, the District has sustained direct, special, and peculiar injuries different in kind from those sustained by members of the general public. Among other things, PFAS contamination physically impaired the District's water-supply source and infrastructure, forced the District to remove the Bonenfant Well from service, interfered with the District's operation and use of the Riverside Wells, and caused the District itself to incur substantial investigation, monitoring, engineering, treatment, construction, operation, and maintenance costs.

155. These injuries arise directly from the District's ownership and operation of its public water system and its use of the contaminated river-connected aquifer as a source of drinking water and are not merely derivative of injuries experienced by the public generally.

156. Defendants' conduct has therefore caused and continues to cause a nuisance actionable by the District pursuant to Maine common law and 17 M.R.S. §§ 2701 and 2802.

157. As a direct and proximate result of Defendants' conduct and the resulting nuisance, Plaintiff has incurred and will continue to incur substantial damages, including costs necessary to investigate, monitor, treat, and respond to contamination of its drinking water supply.

158. Plaintiff is entitled to recover its damages and all other relief available under Maine law, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## Continuing Private Nuisance

159. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

160. Plaintiff owns, operates, possesses, and uses real property, groundwater wells, treatment facilities, and associated infrastructure comprising its public drinking water system, including the Riverside Wells and property from which the District withdraws groundwater for public water supply.

161. Plaintiff is entitled to use and enjoy that property and infrastructure for the withdrawal, treatment, and distribution of drinking water without substantial and unreasonable interference caused by contamination originating from Defendants' facilities.

162. Defendants intentionally engaged in the industrial operations, waste-management practices, wastewater discharges, residuals handling, disposal activities, and other conduct alleged herein that created and/or continued conditions resulting in releases of PFOA, PFOS, and other PFAS into the Kennebec River watershed and associated groundwater.

163. Upon information and belief, Defendants created and/or continued those conditions with knowledge that PFAS and PFAS-containing waste streams generated by their operations were being or had been released into wastewater, surface water, groundwater, soils, sludge, residuals,

landfill leachate, stormwater, and other environmental media, and with knowledge that harm to downstream water resources and users was occurring or was substantially certain to follow.

164. Defendants' conduct resulted in the type of interference described above. PFOA, PFOS, and other PFAS released from Defendants' facilities migrated through the Kennebec River watershed and hydrologically connected groundwater and contaminated the source aquifer and water withdrawn through the District's Riverside Wells.

165. The resulting interference with Plaintiff's use and enjoyment of its property and public water-supply infrastructure has been substantial. PFAS physically contaminated the District's drinking water source, impaired the use and operation of the Riverside Wells, forced the District to remove the Bonenfant Well from service, and required substantial investigation, engineering, treatment, and construction measures before the affected source could safely be returned to unrestricted use.

166. The physical contamination of the District's source water and resulting impairment of its water-supply property and infrastructure constitute substantial interference with Plaintiff's use and enjoyment of its property.

167. The interference is unreasonable in its nature, extent, and duration. PFOA and PFOS are highly persistent and mobile contaminants that remain in environmental media for extended periods, continue to migrate through surface water and groundwater, and require costly and long-term treatment to prevent their presence in drinking water supplied to the public.

168. Defendants' creation and continuation of the conditions resulting in PFAS contamination of Plaintiff's drinking water source and property therefore constitute a continuing private nuisance under Maine law.

169. As a direct and proximate result of Defendants' conduct and the resulting private nuisance, Plaintiff has incurred and will continue to incur substantial damages, including costs associated with investigation, monitoring, engineering, treatment, restoration, operation, and maintenance of its affected water-supply system, for which Plaintiff is entitled to recover in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Continuing Trespass

170. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

171. Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Plaintiff's groundwater wells and delivering drinking water to its residents and users of it.

172. Defendants intentionally engaged in the actions that caused the release of PFOA, PFOS, PFNA, PFHxS, and PFHpA from their facilities.

173. Upon information and belief, Defendants knew, or should have known, that PFOA, PFOS, PFNA, PFHxS, and PFHpA contamination migrated through groundwater and surface water contaminating Plaintiff's real property used for collecting, treating, and delivering drinking water and the drinking water itself.

174. Defendants did not and do not have authority, privilege, or permission to trespass upon Plaintiff's property interests.

175. The acts and omissions of Defendants caused the PFOA, PFOS, PFNA, PFHxS, and PFHpA contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, the Kennebec River, nearby surface waters and tributaries, contaminating Plaintiff's real property used for collecting, treating, and distributing drinking water, interfering with its property

rights, including Plaintiff's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff's property and unlawful interference with Plaintiff's property rights.

176. As a direct and proximate result of Defendants' conduct in creating an ongoing trespass against Plaintiff's property, in the form of the ongoing PFOA, PFOS, PFNA, PFHxS, and PFHpA contamination of Plaintiff's water system, Plaintiff has incurred substantial damages and will incur additional damages to remove PFOA, PFOS, PFNA, PFHxS, and PFHpA from the public water supply in order to provide its residents and customers with clean and healthy water.

177. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

## SIXTH CAUSE OF ACTION
### Negligence

178. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

179. Each Defendant owed the District a duty to exercise reasonable care in the use, handling, storage, treatment, discharge, and disposal of PFAS-containing materials and wastes—including process wastewater, landfill leachate, sludge and other residuals, and stormwater—so as not to contaminate the Kennebec River and the hydraulically connected groundwater from which the District draws public drinking water. That duty extended to wastes a Defendant sent off-site for treatment or disposal, including process wastewater conveyed to a publicly owned treatment works and sludge and residuals applied to land.

180. The District was a foreseeable plaintiff. Each Defendant knew that its facility discharged to the Kennebec River or managed wastes within its watershed, and that the river and

its hydraulically connected groundwater supply public drinking water downstream, including through the Riverside Wells.

181. Defendants knew or should have known that PFOA, PFOS, and other PFAS are persistent, mobile, bioaccumulative, and toxic, and that releasing them would contaminate downstream water supplies. As alleged above, Kimberly-Clark patented paper treated with FC-95, the potassium salt of PFOS, by 1970 and was meeting with 3M about fluorochemical products by 1993, and Huhtamaki met regularly with PFAS manufacturers and monitored PFAS testing and regulatory developments. The risks of PFOA and PFOS were widely publicized no later than 2000, when 3M announced it would phase out PFOS-based chemistry; in 2006, when EPA launched the PFOA Stewardship Program; in 2009, when EPA issued provisional drinking water health advisories for PFOA and PFOS; and in 2016, when EPA issued lifetime drinking water health advisories for PFOA and PFOS and FDA revoked food-contact authorizations for certain long-chain PFAS used in paper. In 2019, Maine DEP began requiring PFAS testing of papermill residuals before land application.

182. Defendants breached their duties by, among other things: discharging PFAS-containing process wastewater, landfill leachate, and stormwater to the Kennebec River and its tributaries without treatment capable of removing PFAS; conveying PFAS-containing process wastewater to a municipal treatment plant that they knew or should have known could not remove PFAS; disposing of PFAS-containing sludge and residuals without controls adequate to prevent PFAS from leaching, and applying them to land within the Kennebec River watershed; failing to characterize, monitor, or disclose PFAS in their waste streams; and failing to investigate, contain, and remediate PFAS releases after they occurred.

183. Defendants' breaches are continuing. Upon information and belief, Sappi has continued to discharge PFAS-containing effluent to the Kennebec River and to generate and discharge PFAS-laden landfill leachate after Maine DEP's LD 1911 testing documented PFAS in its effluent and leachate, and Huhtamaki continues to convey PFAS-containing process wastewater to KSTD.

184. Defendants' breaches were a direct and proximate cause of the District's injuries. PFOA, PFOS, and other PFAS released as a result of those breaches entered the Kennebec River and its hydraulically connected groundwater and physically contaminated the District's Riverside Wells, the water they produce, and the District's associated treatment and distribution infrastructure.

185. As a direct and proximate result of Defendants' negligence, the District has suffered physical injury to its property and has incurred and will continue to incur damages, including costs to investigate, sample, and monitor PFAS contamination; to design, construct, operate, and maintain the ion-exchange treatment system; the loss of use of the Bonenfant Well; and other costs necessary to restore and protect its drinking water supply.

186. The District seeks compensatory damages in an amount to be determined by a jury at trial.

## <u>SEVENTH CAUSE OF ACTION</u>
## Failure To Warn

187. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

188. Defendants breached their duty to notify and warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and

PFHpA, and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Plaintiff's water source.

189. Upon learning of the release of hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and PFHpA and/or products containing PFOA, PFOS, PFNA, PFHxS, and PFHpA, and other toxic chemicals at their facilities and/or properties, Defendants owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

190. Defendants breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and PFHpA, and other toxic chemicals, on and under their properties and, consequently, into Plaintiff's water source.

191. As a result of Defendants' breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

192. As a direct and proximate result of Defendants' above-described failure to provide warnings, Plaintiff has incurred and will continue to incur the following damages:

a. Existing contamination of Plaintiff's water supply, which may have been prevented or mitigated if timely warnings were given;

b. Costs of additional testing and monitoring of the hydrological features and Plaintiff's drinking water well for hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and PFHpA, and other toxic chemicals' contamination;

c. Costs of investigations, risk assessment and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and PFHpA, and other toxic chemicals;

d. Costs of treatment for hazardous substances, including but not limited to PFOA, PFOS, PFNA, PFHxS, and PFHpA, and other toxic chemicals, including design, installation and operation of remediation systems to remove PFOA, PFOS, PFNA, PFHxS, and PFHpA to a safe level of non-detect;

e. Loss of water production capacity;

f. Diminished consumer confidence in Plaintiff's drinking water;

g. Potential cost to design and install replacement water sources;

h. Attorney fees and costs; *and*

i. Other compensatory damages.

193. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing claims, Plaintiff, Greater Augusta Utility District, requests that the Court grant the following relief:

A. Find Defendants liable, jointly and severally, under 42 U.S.C. § 9607(a), for all necessary response costs incurred by Plaintiff consistent with the National Contingency Plan in response to releases and threatened releases of the hazardous substances PFOA and PFOS that have contaminated and threaten to contaminate Plaintiff's public drinking water supply, including costs of investigation, monitoring, sampling, hydrogeologic evaluation, engineering, treatment, remediation, and related response activities;

B. Enter a declaratory judgment pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) declaring Defendants liable for Plaintiff's future necessary response costs consistent with the National Contingency Plan arising from releases and threatened releases of PFOA and PFOS affecting Plaintiff's public drinking water supply, including future treatment, operation, maintenance, monitoring, and remediation costs;

C. Award Plaintiff compensatory damages under Maine law for Defendants' statutory and continuing public nuisance, continuing private nuisance, continuing trespass, negligence, and failure to warn, including damages resulting from PFOA, PFOS, PFNA, PFHxS, PFHpA, and other PFAS contamination of Plaintiff's drinking water sources, property, wells, and water-supply infrastructure;

D. Pursuant to 17 M.R.S. §§ 2702 and 2705, order such abatement, injunctive, and equitable relief as is necessary and appropriate to abate the statutory and continuing nuisances caused by Defendants, prevent the continuation or recurrence of such nuisances, and prevent further releases of PFAS that corrupt, render unwholesome or impure, or otherwise contaminate the Kennebec River, its hydrologically connected groundwater, and the aquifer supplying Plaintiff's Riverside Wells;

E. Order Defendants to pay for, reimburse, or otherwise bear the costs of treatment and other measures necessary to investigate, monitor, treat, restore, and protect Plaintiff's drinking water supply from PFOA, PFOS, PFNA, PFHxS, PFHpA, and other PFAS contamination, including the costs of treatment systems installed or to be installed by Plaintiff;

F. Award Plaintiff its recoverable costs, expenses, prejudgment and post-judgment interest, and, to the extent authorized by applicable law, reasonable attorneys' fees and legal expenses;

G. Award Plaintiff such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Greater Augusta Utility District, demands a trial by jury on all claims for which a jury trial is available.

Dated: October 6, 2026

Respectfully submitted,

*/s/ James E. Belleau*

James E. Belleau, Esq.
**TRAFTON, MATZEN, BELLEAU & FRENETTE LLP**
10 Minot Avenue
PO Box 4770
Auburn, ME 04212-0470
Tel. (207) 784-4531
jbelleau@tmbf-law.com

James L. Simpson, Esq.
*Pro Hac Vice Forthcoming*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York, NY 10017-6502
Tel. (212) 397-1000
JSimpson@napolilaw.com

Hunter J. Shkolnik, Esq.
*Pro Hac Vice Forthcoming*
**NS PR LAW SERVICES LLC d/b/a NAPOLI SHKOLNIK**
1302 Avenida Ponce de León
San Juan, PR 00907-3982
Tel. (833) 271-4502
Hunter@nsprlaw.com

***Counsel for Plaintiff Greater Augusta Utility District***